```
 1                IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF ARIZONA

 3

 4
      IN RE: BARD IVC FILTERS PRODUCTS    )
 5    LIABILITY LITIGATION,               ) MD No.:
                                          ) MD-15-02641-PHX-DGC
 6

 7

 8

 9

10

11             DO NOT DISCLOSE - SUBJECT TO FURTHER

                      CONFIDENTIALITY REVIEW

12

13

14

15
         VIDEOTAPED 30(b)(6) DEPOSITION OF BARD REACH PROGRAM

16                      (KIMBERLY JOY ROMNEY)

17                         Phoenix, Arizona

                           August 30, 2016

18                            9:00 a.m.

19

20

21

22

23   REPORTED BY:

24   Robin L. B. Osterode, RPR, CSR

25   AZ Certified Reporter No. 50695
```

```
 1                IN THE SUPERIOR COURT OF NEW JERSEY
 2                  LAW DIVISION: CUMBERLAND COUNTY
 3
 4       GEORGE LEUS,                         )
                                              )
 5                 Plaintiff,                 )
                                              )
 6       vs.                                  ) Docket No.:
                                              ) CUM-L-00830-14
 7       AFTAB KHAN, M.D., et al.,            )
                                              )
 8                 Defendants.                )
         _____)
 9
10
11
                  IN THE CIRCUIT COURT OF THE SEVENTEENTH
12
                              JUDICIAL CIRCUIT
13
                    IN AND FOR BROWARD COUNTY, FLORIDA
14
15       CLARE AUSTIN,                        )
                                              )
16                 Plaintiff,                 )
                                              )
17       vs.                                  ) Case No.:
                                              ) 15-008373
18       C.R. BARD, INC., a foreign           ) Div.: 07
         corporation, and BARD PERIPHERAL     )
19       VASCULAR, INC., an Arizona           )
20       corporation; MATTHEW ROBBINS,        )
21       M.D.; and CLEVELAND CLINIC           )
22       FLORIDA,                             )
23                                            )
24                 Defendants.                )
25       _____)
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1         VIDEOTAPED 30(b)(6) DEPOSITION OF BARD REACH
 2   PROGRAM (KIMBERLY JOY ROMNEY), commenced at 9:00 a.m.
 3   on August 30, 2016, at Phoenix, Arizona, before Robin
 4   L. B. Osterode, RPR, CSR, Arizona Certified Reporter
 5   No. 50695.
 6                            * * *
 7
 8   APPEARANCES:
 9      For Plaintiffs:
10           LOPEZ McHUGH, LLP
             By: Ramon Lopez, Esquire
11           By: James J. McHugh, Jr., Esquire
             By: Nicholas R. Graham, Esquire
12           100 Bayview Circle, Suite 5600
             Newport Beach, California  92660
13           (949) 737-1501
             rlopez@lopezmchugh.com
14           (Telephonic appearance.)
15           GALLAGHER & KENNEDY
             By: Robert Boatman, Esquire
16           2575 East Camelback Road, Suite 1100
             Phoenix, Arizona  85016
17           (602) 530-8340
             rwb@gknet.com
18
             WAGSTAFF & CARTMELL, LLP
19           By: David C. Degreeff, Esquire
             4740 Grand Avenue, Suite 300
20           Kansas City, Missouri  64112
             (816) 701-1183
21           ddegreeff@wcllp.com
22           LIEFF CABRASER HEIMANN & BERNSTEIN
             By: Adam H. Weintraub, Esquire
23           250 Hudson Street, 8th Floor
             New York, New York  10013
24           (212) 355-9500
             aweintraub@lchb.com
25
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):
 2      For Plaintiffs:
 3         TORHOERMAN LAW, LLC
            By: Eric Terry, Esquire
 4         101 West Vandalia Street, Suite 350
            Edwardsville, Illinois  62025
 5         (618) 656-4400
            ETerry@THLawyer.com
 6         (Telephonic appearance.)
 7         GOLDENBERG LAW, PLLC
            By: Stuart L. Goldenberg, Esquire
 8         800 LaSalle Avenue, Suite 2150
            Minneapolis, Minnesota  55402
 9         (855) 333-4662
            sgoldenberg@goldenberglaw.com
10         (Telephonic appearance.)
11         FEARS NACHAWATI LAW FIRM
            By: Matthew McCarley, Esquire
12         4925 Greenville Avenue, Suite 715
            Dallas, Texas  75206
13         (214) 461-6231
            mccarley@fnlawfirm.com
14         (Telephonic appearance.)
15      For Defendant C. R. Bard, Inc.:
16         NELSON MULLINS RILEY & SCARBOROUGH, LLP
            By: Matthew B. Lerner, Esquire
17         BY: Brandee J. Kowalzyk, Esquire
            201 17th Street NW, Suite 1700
18         Atlanta, Georgia  30363
            (404) 322-6158
19         matthew.lerner@nelsonmullins.com
20      The Videographer:
21         Jim Lopez
22
23
24
25
```

```
1      A.     Yup.  Uh-huh.
2      Q.     And what else did he tell you about Reach?
3      A.     Just spoke generally that it was -- that
4   they created it, and then launched it with the
5   Meridian filter.
6      Q.     They coordinated the launch of Reach with
7   the Meridian filter launch.  Fair?
8      A.     Yes.
9      Q.     And did they tell you why they did that?
10     A.     It was the product that was coming up next,
11  and it just made sense to put them together.
12     Q.     Okay.  Did they tell you why it made sense
13  to put them together?
14     A.     Not specifically, no.
15     Q.     Is that anything that you asked them about
16  or talked to them about?
17     A.     Not that I recall.
18     Q.     Did they tell you what they believed to be
19  the purpose of the Reach Program?
20     A.     Yes, uh-huh.  The purpose of the Reach
21  Program was to help facilitate patient follow-up, and
22  to just provide a tool for physicians to see their
23  filter patients back for a consultation.
24     Q.     Did they tell you why they believed that
25  patients coming back for consultation was important?
```

```
 1      A.      Yes.
 2      Q.      What did they tell you?
 3      A.      A lot of the work was initiated after the
 4   20 -- the August 2010 communication from the FDA,
 5   that implored implanting physicians to follow up with
 6   their filter patients.  If the indication for filter
 7   had passed, to try to retrieve the filter.
 8      Q.      Did they agree with the FDA's position?
 9      A.      I --
10              MR. LERNER:  Objection to form.
11              THE WITNESS:  -- can't speculate as to
12   whether or not they agreed personally.
13   BY MR. DEGREEFF:
14      Q.      Did they tell you anything about it, about
15   the purpose of Reach, other than it was done in
16   response to the FDA's alert?
17      A.      No, not that I recall.
18      Q.      Okay.  Any other -- anything else you
19   discussed with Bill Little or Bret Baird?
20      A.      No.
21      Q.      And those were the two gentlemen
22   responsible for conceptualizing and making the Reach
23   Program happen; is that fair?
24      A.      Yes.
25      Q.      And both of those gentlemen were gone
```

```
 1   paper with regard to the -- the Reach Program?
 2       A.   No.
 3       Q.   Do you know if one was ever done?
 4       A.   Not to my knowledge.
 5       Q.   Okay.  All right.
 6            Can you give me that, number 4.  Thank you.
 7            Can you tell us how Reach actually works?
 8   Just kind of walk through the process.
 9       A.   Uh-huh.  So when a -- an account is
10   interested in using the Bard Reach Program, they
11   create a physician portal.  They agree to a business
12   associate agreement between themselves and McKesson.
13   They register their site by creating a log-in, a
14   password, providing some basic information about the
15   group of doctors or the practice.
16            Once that happens, they are ready to start
17   enrolling patients.  As they implant a filter, they
18   enroll the patient by providing the patient's name, a
19   phone number for contact, making a couple decisions
20   about follow-up.  Bard Reach is very open to and
21   flexible for the physician to determine when they
22   want to see the patient back.  They let -- put in two
23   dates, when the patient will be back home, and then
24   also when they would like to see the patient back
25   again.
```

```
 1              They -- once they submit that patient into
 2   the Reach Program, McKesson takes over.  The first
 3   call happens around the time that the physician said
 4   that the patient would be home.  McKesson tries to
 5   make three attempts at that call -- they don't try,
 6   they do make three attempts at that call.  They'll
 7   leave a message if they don't contact the patient.
 8              When they do contact the patient, they
 9   introduce themselves, say that they're reaching out
10   on behalf of their physician, Dr. Smith, Dr. Jones,
11   whatever it might be, that they have an IVC filter,
12   and that their physician would like to see them back
13   for follow-up on a date.  They give the date.  They
14   offer to provide the phone number so the patient can
15   call and schedule an appointment.
16              They offer to provide some more information
17   for the patient without their filter, if they'd like.
18   The patient can agree to that or not.  They also
19   offer or ask, I should say, if they can call back
20   closer to their consultation time, as another
21   reminder.  The patient can say yes or no at that
22   point.  If they say no, then they're done, and
23   McKesson will not contact them again.  If they say
24   yes, McKesson will start calling about two to three
25   weeks before that consult date.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              Again, making three attempts at that
 2    second call, and if they are able to get ahold of
 3    that patient, they will again introduce themselves
 4    again, we talked before, and ask if they've scheduled
 5    their consult.  If they have, they encourage them to
 6    keep it, again, providing a phone number if they need
 7    to reschedule.  And if they haven't, they encourage
 8    them to schedule the appointment, again, providing
 9    the phone number and encouraging them to make -- to
10    keep their appointment.
11        Q.    So, essentially, it's a scheduling service
12    for the doctors; is that right?
13        A.    Not necessarily a scheduling, because
14    McKesson is not scheduling anything themselves.
15    McKesson is simply talking to the patients and
16    encouraging them to schedule and to keep their
17    follow-up appointment.
18        Q.    Okay.  So they just essentially call and
19    say, "Hey, you should go back to your doctor"?
20        A.    Yes.
21        Q.    Was this available for only the Denali and
22    the Meridian or did it apply to all Bard filters?
23        A.    We launched it with the Meridian filter and
24    then when we launched the Denali filter in 2013, we
25    included Denali as well.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1      Q.   But if a -- if a patient had a G2 or a G2X

 2   or a Recovery or an Eclipse, could the doctor also

 3   add them to the registry or is it only Meridian and

 4   Denali?

 5      A.   We set it up for just Meridian and Denali.

 6   At the time our plans were to -- we had actually

 7   already discontinued Recovery and G2X.  G2 was

 8   discontinued thereafter.  And the plan was for

 9   Eclipse to do the same.  So we didn't put that into

10   the system.  If we had physicians that wanted to

11   include, for instance, some Eclipse patients, we

12   would allow that to happen.  But it was primarily for

13   Meridian and Denali.

14      Q.   Okay.  What was being done for the patients

15   that had Recovery, G2, G2X, and the other filters, to

16   make sure that they went back to see their doctors?

17           MR. LERNER:  Objection to form.

18           THE WITNESS:  That -- you'd have to talk to

19   their physicians.

20   BY MR. DEGREEFF:

21      Q.   What was being done to make sure that they

22   were aware that they didn't have the best technology

23   filters?

24           MR. LERNER:  Objection to form.

25           THE WITNESS:  Bard -- again, that's the
```

```
 1    you that we have used this for sales reps to give to
 2    their customers when talking about the Bard Reach
 3    Program.
 4        Q.   Okay.  Does Bard consider the -- the Reach
 5    Program a medical monitoring program?
 6        A.   Not at all.
 7        Q.   Okay.  Do you know what I -- what I mean
 8    when I say "medical monitoring program"?
 9        A.   I assume it means something about a patient
10    having monitoring of their device.
11        Q.   Okay.  And what would have had to have been
12    different about Reach for it to be a medical
13    monitoring program?
14             MR. LERNER:  Objection to form.
15             THE WITNESS:  I do not know exactly what a
16    medical monitoring program is, but I know that the
17    Bard Reach Program is only to facilitate follow-up
18    between -- it's an outreach program to facilitate
19    follow-up for retrieval, and not monitoring of the
20    device.
21    BY MR. DEGREEFF:
22        Q.   Okay.  Is the Reach Program designed to
23    help protect patients from the complications inherent
24    with IVC filters, such as fracture, perforation,
25    tilting, injuries, or death?
```

```
 1   aware of the -- the risks and complications

 2   associated with the product.  Right?

 3           MR. LERNER:  Objection to form.

 4           THE WITNESS:  I don't believe that

 5   physicians rely solely on the manufacturer.  There's

 6   lots of sources of information for a physician.

 7   BY MR. DEGREEFF:

 8       Q.   Okay.  Does Bard track the patients that it

 9   contacts with the Reach Program?

10       A.   Bard doesn't contact any patients with the

11   Reach Program.

12       Q.   Does Bard track the patients that McKesson

13   contacts with the Reach Program?

14       A.   Bard has no identifiable patient health

15   information.

16       Q.   Does it track the numbers of people that

17   are contacted?

18       A.   We get an aggregate number, yes.

19       Q.   Okay.  Does it keep track of the

20   percentages of patients that go back for -- to see

21   their physicians, based on the Reach Program?

22       A.   No, we only see what a patient has reported

23   to the McKesson representative, whether or not they

24   actually see their physician, we do not know that.

25       Q.   Okay.  Does Bard or McKesson do anything to
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1      Q.     During the examination earlier today, you
 2   were asked the ways in which the Reach Program can be
 3   customized by doctors at a time they enroll a
 4   particular patient.  Do you recall that discussion?
 5      A.     Yes.
 6      Q.     Can you please explain what can be done by
 7   the physician to customize things at the time of
 8   enrollment?
 9      A.     Sure.  They -- so they can choose language,
10   as we discussed.  They can choose English or Spanish
11   follow-up.  That's one point of customizing it.  The
12   physician gets to choose when -- tell McKesson when
13   to call their patients back.  So they can choose any
14   number of days for their follow-up, and make that
15   decision, based on what the patient needs and what
16   the indication for placement was.
17             They can choose to enroll patients in the
18   Reach Program and have the patient follow up with
19   themselves or with a referring physician, so there's
20   a couple different doctors they can choose to follow
21   up with.  And they can also choose to have no
22   follow-up happen for the patient.
23             Some of our physicians have used the
24   program just as a place to put all that information
25   for their IVC filter patients, but if they're deemed
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   a permanent filter, they could cancel all calls.
 2       Q.    Okay.
 3       A.    And they can do that at implant or any time
 4   thereafter.
 5       Q.    So at the time of enrollment, there's an
 6   option to say we're enrolling the patient, but select
 7   no patient follow-up?
 8       A.    Yes.
 9       Q.    And then after they're actually enrolled,
10   even if the decision initially is to have follow-up,
11   there's an option to -- for the physician to cancel
12   that option as well?
13       A.    Yes.
14       Q.    How long has the Reach Program been in
15   effect?
16       A.    Just about five years.
17       Q.    And on an annual basis, how much does Bard
18   spend, approximately, on that program?
19       A.    We pay a monthly administrative fee to
20   McKesson.  They charge us for every call that they
21   make.  Any material that's also mailed out, on
22   average, it's probably about $6,000 a month, so in a
23   year, about $7,200 [sic].
24       Q.    Okay.  And over the five years that the
25   Reach Program has been in effect, how much do you
```